UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DONALD & KRISTI GRAVELET-BLONDIN, <br><br> Plaintiffs, <br><br> v. <br><br> SGT. JEFF SHELTON, *et al.*, <br><br> Defendants. | Case No. C09-1487RSL <br><br> ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on the parties' cross motions for summary judgment. Plaintiffs Donald and Kristi Gravelet-Blondin, a married couple, move for partial summary judgment on the issue of liability against defendants Sergeant Jeff Shelton and the City of Snohomish.[1] They allege that Sgt. Shelton unlawfully arrested Mr. Gravelet-Blondin, used excessive force, and maliciously prosecuted him in violation of 42 U.S.C. § 1983. They also argue that the City's policy on the use of tasers caused the excessive force. Ms. Gravelet-Blondin asserts a claim for outrage.

---

[1] Plaintiffs dismissed their claims against the third defendant, Officer Carl Whalen, in November 2010. (Dkt. #76).

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 1

1   Defendants move for summary judgment on all claims, arguing that they had probable
2   cause for Mr. Gravelet-Blondin's[2] arrest and that they did not violate his constitutional rights.
3   They contend that even if a constitutional violation occurred, it was not caused by any City
4   policy, and Sgt. Shelton is entitled to qualified immunity. At plaintiffs' request, the Court heard
5   oral argument in this matter on February 2, 2012.

6   For the reasons set forth below, the Court grants defendants' motion and denies plaintiffs'
7   motion.

## II. DISCUSSION

### A. Background Facts.

On the evening of May 4, 2008, Sergeant Shelton was one of five officers dispatched in response to a 911 call regarding a suicidal male. The officers were told that the man, Jack Hawes, had a firearm and kept it with him "at all times," but they were initially unable to locate the weapon at the scene. Declaration of Sergeant Jeffrey Shelton (Dkt. #16) ("Shelton Decl.") at ¶ 2.

When the officers arrived, they observed Mr. Hawes' vehicle parked in the side yard of his property between his house and plaintiffs' house and a blue hose running from the exhaust pipe of the vehicle into one of its windows. At that point, the officers perceived "a greater level of urgency" and "a more imminent threat of harm" because it was clear that Mr. Hawes was "actively trying to kill himself at that time." Wellington Dep. at p. 20. Based on his experience and training, one of the officers perceived a threat to others as well as to Mr. Hawes: "And we also know that suicide can turn to homicide in the blink of an eye because when people don't care whether they live or die, they may take it out on other people as well." Id. at pp. 20-21. As they cautiously approached the vehicle, the officers observed that the hose had fallen away from the exhaust pipe, but they had not yet secured Mr. Hawes or his weapon. Id. at p. 23.

---

[2] Because Mr. Gravelet-Blondin is asserting the vast majority of claims in this action, he will hereinafter be referred to as "plaintiff."

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 2

The officers ordered Mr. Hawes to step out of his vehicle, which he did, but he refused to show his hands as the officers ordered. Because Mr. Hawes refused to show his hands, did not comply with the officers' commands, and attempted to return to the vehicle where the firearm may have been located, one of the officers tased him. Declaration of Richard Jolley, (Dkt. #72) ("Jolley Decl."), Ex. A at p. 5. Despite the use of the taser, Mr. Hawes continued to struggle with the officers. Although Mr. Hawes was 79-years-old at the time, he was surprisingly strong in resisting the officers' efforts to secure him, and three officers had to attempt to secure him. Bowman Dep. at pp. 42-43. As Mr. Hawes was struggling and resisting, he placed his hands underneath him. Fearing that he might try to access a weapon located around his belt line, one of the officers deployed the taser a second time. Wellington Dep. at p. 32. The officers then handcuffed Mr. Hawes.

At some point, Mr. Gravelet-Blondin, dressed in a t-shirt, shorts, and slippers, walked quickly from his property onto Mr. Hawes' property, approaching the group and calling out, "What are you doing to Jack?" Plaintiff's Dep. at p. 45; Declaration of Donald Gravelet-Blondin, (Dkt. #80-17) ("D. Gravelet-Blondin Decl.") at ¶¶ 5-6. Officer Wellington testified that after Mr. Hawes was handcuffed, he heard another officer shout, "Get back." Wellington Dep. at p. 34. He looked up to see plaintiff "standing right over" him, approximately six to ten feet away. Id. at pp. 34-35. At that point, he yelled at plaintiff "at the top of [his] lungs," "'Get back. Police. Get back.'" Id. at p. 36. Although individuals typically retreat after hearing a command like that, plaintiff did not do so. Id. Sgt. Shelton did not know whether Mr. Hawes was handcuffed when Mr. Blondin arrived on the scene. Shelton Dep. at p. 74. Two other officers testified that Mr. Hawes was not yet in handcuffs when plaintiff arrived. Scott Dep. at pp. 30, 34; Whalen Dep. p.7. The officers testified that plaintiff approached to within ten to twenty feet of them. Scott Dep. at p. 31; Shelton Dep. at p. 25. According to plaintiff, Sgt. Shelton ran towards him yelling, "'Get back or I'll tase you' loudly and rapidly." D. Gravelet-Blondin Decl. at ¶ 7. He then "froze" in place 37 feet from Mr. Hawes. Id. (explaining that he

1  measured the distance by tape measure the day after the incident); Plaintiff Dep. at pp. 49-50.
2  By all accounts, plaintiff had approached onto Mr. Hawes' property.

3  Plaintiff's arrival created a distraction while the officers were trying to secure Mr. Hawes.
4  Wellington Dep. at p. 54. "Because when he showed up on the scene, I had to take my attention
5  off of Hawes of [sic] what I was doing. I didn't know what his motives were or why he was
6  there or why he wasn't leaving. So I had to take my attention off of Hawes for the moment to
7  look at him and worry about what he is about to do." Scott Dep. at p. 38. Another officer, who
8  had his back to plaintiff, became worried when he heard the shouting behind him: "We were
9  dealing with a very dangerous, fluid situation, suicidal subject with a gun. I had a gun that I
10 barely had control of. I was in no position to defend myself." Bowman Dep. at p. 95; Shelton
11 Dep. at p. 75 (explaining that plaintiff's presence created a threat to officer safety in part because
12 plaintiff was behind Officer Bowman, who had "his rifle slung with his back turned to me").
13 The officers did not know plaintiff's intentions as he approached the scene and he contributed to
14 a "volatile" scene. Whalen Dep. at p. 23-25. The officers feared that plaintiff could access Mr.
15 Hawes' weapon, which they had not yet located or secured. Id. at p. 24; Scott Dep. at p. 71. For
16 those reasons, they perceived plaintiff to be a threat to their safety. Whalen Dep. at p. 24; Scott
17 Dep. p. 71; Shelton Dep. at pp. 16-17, 23; see also Turner Dep. pp. 74-78.

18 After another officer unsuccessfully instructed plaintiff to leave the area, Sgt. Shelton left
19 his post, where he was overseeing the situation with Mr. Hawes, and loudly and authoritatively
20 demanded that plaintiff leave the scene. Whalen Dep. at p. 10. Sgt. Shelton commanded
21 plaintiff to leave the crime scene several times, explained that the officers were involved in a
22 police matter, and warned him that he would be tased and arrested if he refused to leave. Id.;
23 Jolley Decl., Ex. A at p. 5; Shelton Dep. at pp. 77-78. After plaintiff refused to retreat, Sgt.
24 Shelton tased him with a Taser X26 in dart mode for approximately two seconds. Jolley Decl.,
25 Ex. A at p. 6. In his report, Sgt. Shelton notes that the "usual" length of the taser is five seconds.
26 Id. The barbs of the taser hit plaintiff in the abdomen. Plaintiff Dep. at p. 65. As a result,

27

28

plaintiff fell down and temporarily lost consciousness. Id. at p. 66. Mrs. Gravelet-Blondin observed Sgt. Shelton tase her husband and when she protested, Sgt. Shelton threatened to tase her too if she did not get back. Id. at pp. 70-71; Whalen Dep. at pp. 18-19. The paramedics arrived and removed the taser barbs from plaintiff's abdomen. Plaintiff did not request or receive additional medical attention. Plaintiff Dep. at p. 72. The police later recovered a loaded handgun from Mr. Hawes' vehicle. Jolley Decl., Ex. A at p. 6.

Sgt. Shelton issued plaintiff a criminal citation for obstruction. Plaintiffs contend that they incurred attorney's fees and costs before the action was dismissed with prejudice.

Plaintiffs filed their complaint in this Court in October 2009. Mr. Gravelet-Blondin alleges claims under 42 U.S.C. § 1983 for excessive force, arrest without probable cause, and malicious prosecution. Ms. Gravelet-Blondin asserts a claim for outrage. Complaint at § 6.3 ("Defendant City of Snohomish is liable for the intentional infliction of emotional distress on plaintiff Kristi Gravelet-Blondin by shooting her husband with a Taser, arrested him [sic], and taking him away; all in her presence, and when one of them threatened to shoot her with a Taser as well.").

**B.     Summary Judgment Standard.**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, the records show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

All reasonable inferences supported by the evidence are to be drawn in favor of the nonmoving party. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). "[I]f a rational trier of fact might resolve the issues in favor of the nonmoving party, summary

judgment must be denied." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Id. at 1221.

On cross motions for summary judgment, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1134 (9th Cir. 2001). The duty to review all evidence submitted by both parties arises from the obligation to determine whether any disputed issues of material fact exist. Id. at 1136. The Court must also analyze each motion separately on its own merits. Id.

**C.     Excessive Force Claim.**

   **1.     Qualified Immunity.**

In March 2010, the Court denied plaintiffs' motion for partial summary judgment on the defense of qualified immunity. (Dkt. #29). Since then, the parties have conducted additional discovery, and the factual record is more developed. In addition, the Ninth Circuit has issued an *en banc* decision clarifying the law in this circuit regarding police use of tasers. Mattos v. Aragano, 661 F.3d 433 (9th Cir. 2011). With the benefit of that guidance and an augmented record, the Court again considers the issue of qualified immunity.

The Court analyzes plaintiff's excessive force claim under the Fourth Amendment's prohibition on unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989). The analysis is focused on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Id. at 397. We must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the

countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "Stated another way, we must balance the amount of force applied against the need for that force." Bryan v. MacPherson, 630 F.3d 805, 823-24 (9th Cir. 2010) (internal citation and quotation omitted).

The Court first considers the nature and amount of force Sgt. Shelton used against plaintiff. As the Ninth Circuit has explained,

> The X26 uses compressed nitrogen to propel a pair of 'probes' -- aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires -- toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body.

Bryan, 630 F.3d at 824 (internal citations omitted). As a result of the taser, plaintiff experienced "excruciating pain," temporary paralysis, and brief loss of consciousness. D. Gravelet-Blondin Decl. at ¶ 8. Unlike the plaintiff in Bryan, plaintiff did not suffer an additional injury when he fell to the ground, although Sgt. Shelton has not stated that he considered the fact that plaintiff was standing in grass when he tased him. The Ninth Circuit has held, "The physiological effects, the high levels of pain, and foreseeable risk of physical injury lead us to conclude that the X26 and similar devices are a greater intrusion than other non-lethal methods of force we have confronted." Bryan, 630 F.3d at 825. Therefore, "tasers like the X26 constitute an intermediate or medium, though not insignificant, quantum of force" that "must be justified by the governmental interest involved." Id. at 826.

Under Graham, the Court evaluates the government's interest in the use of force by examining three core factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "These factors, however, are not exclusive." Bryan, 630 F.3d at 826. Instead, the Court must consider the "totality of the circumstances" and "whatever specific factors may be appropriate in a particular case,"

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 7

regardless of whether they are listed in Graham. Id. (internal citation and quotation omitted).

The "most important" Graham factor is whether the suspect posed an "immediate threat to the safety of the officers or others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005). Sgt. Shelton testified that he believed that plaintiff was "dangerous" because of the presence of the unsecured weapon. Shelton Dep. at pp. 12-13. However, "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001). In this case, construing the facts in the light most favorable to plaintiff, he was standing thirty-seven feet away from the officers, and he was not moving. Rather than physically or verbally threatening the officers, plaintiff's only comment was to ask what they were doing to his neighbor. Although the officers feared that he might be armed, their fear was based on nothing more than the reality that any civilian could be armed, speculation that fails to distinguish plaintiff from any bystander at a crime scene.

Defendants stress that the scene was not yet secure, and Mr. Hawes' gun had not yet been located. Certainly, the presence of the unsecured weapon made the scene more dangerous and volatile than the scenes confronting the officers in the Bryan, Mattos, and Brooks cases where the Ninth Circuit found constitutional violations. However, the key inquiry is whether *plaintiff* posed an immediate threat. Mattos, 61 F.3d at 449. Although plaintiff could have attempted to access the unsecured weapon or one of the officers' weapons, he made no move to do so and did not threaten the officers. Nor is there any evidence that the officers believed that the weapon was lying in the grass near plaintiff or was otherwise readily accessible to him. Sgt. Shelton's desire to gain immediate control of plaintiff was understandable because his attention was needed elsewhere: to assist with Mr. Hawes and locate his weapon. However, that exigency alone is insufficient to justify the use of force here. Deorle, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury.").

The officers testified that plaintiff posed a threat primarily because of his continued presence near the dangerous, volatile crime scene. However, there were four other officers at the scene, and viewed in the light most favorable to plaintiff, Mr. Hawes was already in handcuffs. Wellington Dep. at p. 34. At that point, Sgt. Shelton, who was supervising, was neither actively assisting nor attempting to locate the weapon when plaintiff arrived at the scene. Shelton Dep. at pp. 74-75. Therefore, Sgt. Shelton could have remained prepared to use the taser in the event that the circumstances changed. Bryan, 630 F.3d at 827 (explaining that "while confronting Bryan, Officer MacPherson had upholstered and charged his X26, placing him in a position to respond immediately to any change in circumstances."). Under the circumstances and construed in the light most favorable to plaintiff, plaintiff did not pose an *immediate* threat.

Moreover, the Ninth Circuit has explained that obstruction, the crime with which plaintiff was charged, is not a serious crime. Mattos, 661 F.3d at 444 (noting that obstructing a police officer is not a serious crime) (citing Davis v. City of Las Vegas, 478 F.3d 1048, 1055 (9th Cir. 2007)). As for the third factor, the Ninth Circuit has explained that the "crux" of the inquiry is "compliance with the officers' requests, or refusal to comply." Mattos, 661 F.3d at 450. Although plaintiff refused to comply with repeated and clear commands to back up, his resistance was not "particularly bellicose." Bryan, 630 F.3d at 830. After being ordered to stop, he did not advance, threaten the officers, attempt to flee, or physically resist the officers. Therefore, these factors weigh against a finding that the level of force used was reasonable. Bryan, 630 F.3d at 832 (finding that plaintiff alleged a constitutional violation where he was tased in dart mode even thought he "was neither a flight risk, a dangerous felon, nor an immediate threat.").

The Court also considers additional relevant factors. Under plaintiff's version of events, only fifteen seconds elapsed between when he was first ordered to back up and when he was tased. Plaintiff Dep. at p. 58. Although Sgt. Shelton warned plaintiff that he would be tased if he did not back up, according to plaintiff, that warning was issued while Sgt. Shelton was tasing

plaintiff. Id. at pp. 56-57. Assuming those facts to be true, he was offered no time to comply with the warning, which supports a finding of a constitutional violation. Mattos, 661 F.3d at 451. The Court also considers the "danger the overall situation posed to the officers' safety and what effect that has on the reasonableness of the officers' actions." Id. at 451. While the presence of an unsecured weapon created a potentially dangerous situation, with Mr. Hawes in handcuffs, less force could have been used to prevent plaintiff from accessing the unsecured weapon. For all of these reasons, the Court finds that under the facts construed in a light most favorable to plaintiff, employing the taser against plaintiff constituted excessive force.

Having found that Sgt. Shelton used excessive force, the Court considers whether he is nevertheless entitled to qualified immunity. To resolve that question, the Court must determine, as of the time Sgt. Shelton tased plaintiff, whether it was "sufficiently clear that every reasonable official would have understood that what he was doing violated" plaintiff's constitutional rights. Mattos, 661 F.3d at 446 (internal citations and quotations omitted). If his use of force was "premised on a *reasonable* belief that such force was lawful," he is entitled to qualified immunity even if the force used was excessive. Deorle, 272 F.3d at 1285 (emphasis in original).

In Mattos, the Ninth Circuit found that as of August 2006, there was no Supreme Court or Ninth Circuit case addressing the use of tasers in dart mode. Mattos, 661 F.3d at 452. By May 2008, the state of the law in this circuit was no clearer; no Supreme Court or Ninth Circuit opinion was issued in the interim. As set forth in Mattos and Bryan, the few circuit court cases that existed at the time were dissimilar. Id. at 446-48;[3] Bryan, 630 F.3d at 833. Even though the facts of this case are distinguishable from those earlier, out of circuit cases where no constitutional violation was found, a reasonable officer in Sgt. Shelton's position "could have made a reasonable mistake of law regarding the constitutionality of the taser use in the

---

[3] The Court in Mattos distinguished three earlier cases from other circuits. Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992); Hinton v. City of Elwood, 997 F.2d 774 (10th Cir. 1993); Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 10

circumstances" confronted. Bryan, 630 F.3d at 833.

Plaintiff argues that Sgt. Shelton is not entitled to qualified immunity because the law was clear in 2008 that no force was justified under these circumstances. However, even though the Court has found that the risk was not immediate, the evidence shows that plaintiff's continued presence and refusal to leave the volatile scene created a safety risk. Ovens Dep. at p. 26 (explaining that the officers would have perceived plaintiff as a threat); Shelton Dep. at pp. 12-13, 74-75 (explaining why plaintiff created a threat to the officers' safety); Turner Dep. at pp. 75-78. The officers did not know whether plaintiff was armed or why he was refusing to comply with their commands, which was unusual and very concerning. Turner Dep. at p. 77. During oral argument, plaintiffs' counsel criticized defendants' evidence, and in particular the expert opinion of Thomas Ovens, but they offered no contrary expert opinion. Even if Mr. Hawes was restrained by the time Sgt. Shelton tased plaintiff, the officers had not yet secured his weapon or the crime scene. The scene was "tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 296-97. Therefore, even if the quantum of force used was excessive, Sgt. Shelton could have reasonably believed that some force was permissible.

In sum, although plaintiff has alleged an excessive force claim, the law was not sufficiently clear in May 2008 to render the alleged violation clearly established. Therefore, Sgt. Shelton is entitled to qualified immunity regarding plaintiff's excessive force claim.

**2.      Municipal Liability.**

The Court's finding that Sgt. Shelton is entitled to qualified immunity does not absolve the City of liability because the doctrine does not apply to municipalities. See, e.g., Owen v. City of Independence, 445 U.S. 622, 639, 650-51, 657 (1980) (explaining that municipalities are not entitled to qualified immunity). Therefore, the Court must separately determine whether the City is liable. As announced by the Supreme Court, a government entity can be responsible for a constitutional violation committed by an employee if the "execution of a government's policy or custom . . . inflicts the injury." Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978).

Despite the contrary suggestion in plaintiffs' briefing, they are not required to prove that the City's policy was unconstitutional. See, e.g., Chew v. Gates, 27 F.3d 1432, 1444 n.12 (9th Cir. 1994). Rather, plaintiffs must prove that the specific use of force violated the Constitution, and that City policy caused the unconstitutional application of force in this instance. Id. at 1444. In light of those elements, and in light of the fact that qualified immunity is unavailable to the City, defendants' argument that the Bryan, Mattos and Brooks cases were decided after the events underlying this case is irrelevant.

To prove the causation element, plaintiffs must show that the policy was the "proximate cause of the injuries suffered." Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996). Stated another way, plaintiffs must show that the policy was the "moving force" behind the constitutional violation. Id. at 835 (internal citation and quotation omitted).

In this case, plaintiffs contend that the City's policy caused the use of excessive force because the policy classifies the use of a taser as a low level of force, on par with the use of pepper spray.[4] Declaration of Joseph Shaeffer, (Dkt. #74) ("Schaeffer Decl."), Ex. 1. Even assuming that the use of force was unconstitutional, plaintiffs have not shown that the City's policy was the moving force behind the violation. During his deposition, Sgt. Shelton testified that he did not tase plaintiff because of the City's policy. Shelton Dep. at p. 211. There is no evidence that Sgt. Shelton would have used a lower level of force if the policy had been different.[5] In fact, the evidence belies that theory. Sgt. Shelton testified that he believed that he

---

[4] Alternatively, "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992). In this case, plaintiffs' assertion of a ratification theory is unnecessary because the City readily admits that its policy classifies the taser as a low level of force.

[5] Plaintiffs also argue that in 2009, Sgt. Shelton responded to an allegation that he had overused the taser in another case by noting that the City's policy designated it as the same level of force as "hands on." Shaeffer Decl., Ex. 7. Plaintiffs, however, have offered no testimony or other evidence to link that 2009 statement to the conduct that occurred in 2008. At most, Sgt.

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 12

1 was entitled to use even more force against plaintiff because of the threat he posed. Shelton Dep. at pp. 61-63 (explaining that he would have been justified in kicking and punching plaintiff or using his baton). The policy also states that the degree of force used should be "in direct relationship to the amount of resistance used by the person, or the immediate threat the person poses to the member or others." Shaeffer Decl., Ex. 1; Ovens Dep. at p. 31 (explaining that "irregardless of how good or bad an agency or individual officer's idea of force continuum is, they still have to use reasonable force. You don't get to go, "Well, my force continuum said this, so I get to do that."'). In his declaration, Sgt. Shelton explained that he chose to use the taser "so Plaintiff would be temporarily incapacitated and [he] could gain custody of him immediately and alleviate the safety concerns caused by his presence." Shelton Decl. at ¶ 14. In light of that evidence, it is clear that Sgt. Shelton deployed his taser because he believed it was not only justified but necessary under the factual circumstances. Even if his judgment was ultimately incorrect, the policy was not the moving factor. Therefore, the City cannot be held liable for the constitutional violation.

**D. Claims for False Arrest and Malicious Prosecution**

Probable cause is a complete defense to claims for false arrest and malicious prosecution. See, e.g., Hanson v. City of Snohomish, 121 Wn.2d 552, 563 (1993). In Washington, "probable cause exists when the facts and circumstances known to an arresting officer are sufficient to convince a reasonable person that a crime has been committed and that the person to be arrested committed that crime." Jamison v. Storm, 426 F. Supp. 2d 1144, 1161 (W.D. Wash. 2006).

The obstruction statute provides that "a person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020. "The statute's essential elements are (1) that the action or inaction in fact hinders, delays, or obstructs; (2) that the hindrance, delay, or obstruction be of a public servant in the midst of discharging his official

---

Shelton's statement shows that he was aware of the City's policy, which is undisputed.

powers or duties; (3) knowledge by the defendant that the public servant is discharging his duties; and (4) that the action or inaction be done knowingly by the obstructor." State v. Ware, 111 Wn. App. 738, 742-43 (2002) (internal citation and quotation omitted).

Plaintiffs argue that a statute cannot criminalize the failure to obey a police order, but the case they cite in support relates to a portion of the obstruction statute not at issue here. State v. White, 97 Wn.2d 92, 95 (1982) (finding statute unconstitutionally vague when it criminalized the failure "without lawful excuse" to provide true information "lawfully required" of an individual by a "public servant"). In contrast, the obstruction statute at issue in this case has been ruled constitutional. State v. Lalonde, 35 Wn. App. 54 (1983); State v. Grant, 89 Wn.2d 678 (1978) (upholding the constitutionality of a prior version of the statute).[6]

In this case, plaintiff attempts to define his conduct as protected speech by contending that he was arrested simply for asking what the officers were doing to his neighbor. He argues that he created a "verbal distraction," which the Supreme Court held cannot be criminalized in Houston v. Hill, 482 U.S. 451 (1987). In that case, however, the Court drew a distinction between "contentious speech," which cannot be criminalized, and physically obstructing a police investigation, which can be. Id. at 463. In this case, there is no evidence that plaintiff was arrested because of his speech.

Instead, plaintiff obstructed the officers through his conduct. He knowingly placed himself in a volatile, active crime scene, diverted the officers' attention from the performance of their official duties, created at least a potential safety hazard for the officers, and refused to leave the scene after being clearly instructed to do so by at least two officers. Wellington Dep. at p. 54; Scott Dep. at p. 38; Whalen Dep. at p. 10 (explaining that Sgt. Shelton had to leave his

---

[6] Plaintiffs are not alleging that the statute is facially unconstitutional. Rather, they contend that if the statute criminalizes a mere failure to obey a police command, then it would be unconstitutional. Plaintiff's Motion at p. 13. Defendants are not making that assertion, which Washington courts have already addressed. For those reasons, the Court has not invited the Attorney General to weigh in on the constitutionality of the statute.

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 14

position to deal with plaintiff). In an analogous case, the court explained, "Lalonde had knowledge that a uniformed police officer was attempting to arrest another [person]. The trial judge found his conduct in reapproaching and conversing with the officer in this situation hindered, delayed, and obstructed the officer and interfered with the officer's discharge of his duties." Lalonde, 35 Wn. App. at 61. Although the factual circumstances in this case are not identical, they are analogous. As in that case, plaintiff's "arrest did not arise from his speech, but from the acts which accompanied his words." Id.

Plaintiff argues that he did not knowingly interfere. Instead, plaintiff contends that he knew he should retreat but he "froze" and was therefore physically unable to move away. However, the officers did not know why he was refusing to comply. Moreover, the officers were in uniform, plaintiff knew they were officers when they ordered him to step back, and it was obvious that the officers were engaging in their official duties. Plaintiff Dep. at pp. 54-58. Plaintiff refused to (or was unable to) comply with the command to move back even after he saw Sgt. Shelton leave his position to deal with him. Under the circumstances, a reasonable person could have concluded that plaintiff was obstructing the officers. Id.; State v. Ware, 111 Wn. App. at 743-44. Accordingly, the Court grants defendants' motion for summary judgment regarding plaintiff's claims for false arrest and malicious prosecution.

**E.    Plaintiff Kristi Gravelet-Blondin's Claim for Outrage**

In order to prove her claim for outrage, Ms. Gravelet-Blondin must prove: "(1) extreme and outrageous conduct; (2) the intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of emotional distress." Rice v. Janovich, 109 Wn.2d 48, 61 (1987). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. Phillips v. Hardwick, 29 Wn. App. 382, 387 (1981).

The Court must consider whether the conduct at issue is "so outrageous in character, and

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Grimsby v. Samson, 85 Wn.2d 52, 59 (1975). In conducting its analysis, the Court must consider: (1) a defendant's position; (2) whether the plaintiff was particularly susceptible to emotional distress, and if the defendants knew this fact; (3) whether the defendant's conduct may have been privileged under the circumstances; (4) whether the degree of emotional distress caused by a party was severe as opposed to mere annoyance, inconvenience, or normal embarrassment; and (5) whether the actor was aware that there was a high probability that his or her conduct would cause severe emotional distress and proceeded in a conscious disregard of it. Spurrell v. Block, 40 Wn. App. 854, 862 (1985).

In this case, plaintiffs have not shown that Ms. Gravelet-Blondin was particularly susceptible to emotional distress, that defendant knew she was susceptible, or that Sgt. Shelton knew she was in the vicinity and could observe him tasing her husband. One of the officers testified during his deposition that Ms. Gravelet-Blondin was still on her own property when the officers handcuffed plaintiff. Whalen Dep. at p. 18. Furthermore, even though watching her husband tased and fall to the grass was likely upsetting, and she has sought medical treatment, the conduct is well below the type of conduct that has been deemed actionable. For example, in Grimsby, the Washington Supreme Court found that a husband could proceed with his outrage claim alleging that he "was required to witness the terrifying agony and explicit pain and suffering of his wife while she proceeded to die right in front of his eyes and at all times remaining helpless because of his inability to secure any medical care or treatment for his wife at all." 85 Wn.2d at 60 (italics removed); see also Anderson v. Kitsap County, 2010 U.S. Dist. LEXIS 53679 at *19 (W.D. Wash. June 1, 2010) (dismissing outrage claim brought by wife who observed her husband "being treated shamefully, humiliated and arrested" and called a "Fucking Nigger" by a Sergeant). Therefore, because the conduct Ms. Gravelet-Blondin alleges is not extreme and outrageous, her outrage claim fails as a matter of law.

### III. CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendants' motion for summary judgment (Dkt. #71) and DENIES plaintiffs' motion for partial summary judgment (Dkt. #73). The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs.

DATED this 6th day of February, 2012.

*[signature]*
Robert S. Lasnik
United States District Judge